Mayor Jeff Sheik, representing Mr. King, may it please the Court and Council. Mr. King brought causes of action against the Guardian Ad Litem program for whistleblower age, race, and gender discrimination. And I'm going to be focusing on the Minnesota Whistleblower Act as far as my main argument, but certainly will take any questions relating to the other causes of actions. Mr. King started his employment in 2002. Ultimately, he became the Guardian Ad Litem District Manager. In July, Ms. Treble became his manager, but prior to that he had an excellent work history. Ms. Treble, once she got in as manager, was informed by Mr. King in March 2017 that there was some discrepancies with the reporting as far as which judicial districts would get certain amounts of money and that the judicial districts were informed of these discrepancies and so that it was thought that some of the judicial districts were trying to keep the cases open in juvenile court. On that point, Council, I was going to ask you, what's your best case that that was protected conduct? That actual report where he's indicating to you in the October 5th where he says it's spurious conduct, it's our position that that basically is equivalent to fraudulent conduct. And there's a Minnesota statute that we were asking under, it was like 609, where that public funding should not be frivolously spent or in a manner that Mr. King knew or should have known about. So it's our position that he was basically required or mandated to report that to Ms. Treble. And there was some testimony from other people that that would be considered fraudulent conduct and that he should in fact report that to Ms. Treble and that would be protected conduct. Thank you, Your Honor. And it's our position that that issue was conceded, but I understand that ultimately the court will make that decision. But it's our position that that was conceded by the state and that the whistleblower law is pretty broad and has been recently amended at least in the last five or six years as far as... It's not argued, Council. I was just curious because it's an unusual type of protected conduct in my experience with these kinds of cases. I will agree with that, Your Honor. Thank you. So then within, and I know the courts have been, you know, kind of all over the board as far as what constitutes a reasonable amount of time after the protected conduct is reported and the adverse action. In our brief on pages 47 through 52, we do outline the nexus or the causation argument, which I think I would like to be focusing on the most. Then I'd like to focus on the reasons for the termination, which, you know, it's our position we're pretextual in nature. But basically there's about a six-month period from when Mr. King reports the conduct to when he is terminated or put on notice for termination. Then ensues approximately a five-month termination investigation. And then on March 6, 2018, which is about five months later almost to the day, he's noticed for termination. There was some discussion by the trial court that Ms. Treble did in fact, you know, thank him for his reporting of this conduct. It's our position that that was, you know, kind of disingenuous to some extent and that Capella, who's another judicial district manager, stated that, you know, she thought that Capella was threatened by his intelligence and how he was running the program and that she felt threatened by that and that she was intimidated by him because he ultimately in our position had actually more experience than Ms. Treble in that position. Focusing on the pretextual reasons that the state outlined in a March 6, 2018 letter basically outlining the causes or the reasons for termination. It's our position that those reasons are pretextual. You know, a lot of times in these proceedings, courts will ask me, you know, these are just bare assertions that you're stating. It's our position, you know, we're kind of flipping on the defendant. They've made some accusations and they're pretty strong accusations that Mr. King, you know, had sexual relations with two individuals, Mrs. A and Mrs. B, Mrs. AA and Mrs. BB. It's our position that there's nothing in the record from the state stating affirmatively that that in fact actually happened. In effect, the relationships were consensual. I asked the court to look at our exhibit I of our summary judgment. The pretextual issue is whether the defendants, whether there's any evidence the defendants didn't legitimately believe in the non-discriminatory reasons they put forth. Not whether we went to trial on all those allegations of misconduct, one side or the other would win or lose. Correct, and it's our position that Treble was basically in charge of the investigation, and so she could kind of manipulate the process to some extent. So it's our position, you know, there was a thorough investigation done on this thing and the allegations against my client, and it's our position, are very, very weak and have not been supported through actual evidence, which, you know, I think that there's a quote saying that colleagues believed that there was inappropriate sexual relationships, but when I asked or when the attorney asked Miss Potter, who was the HR representative, the question was did you ever in the investigation discover that Mr. King had engaged in any kind of sexual relations with any individual, and the answer to that was no, and that the state has continually argued, even in the brief now, that Mr. King used it as a dating service. You know, it's our position that there's no evidence to that, and that's kind of an inflammatory statement, which is not supported by the evidence, and they also said that there's an episode of Mad Men, you know, it's our position that that is also not supported by the actual evidence. Another judge, there was accusations that he was having an inappropriate relationship with a judge, who they never interviewed, by the way. We did, and we stated in our brief, and they interviewed, you know, approximately 35 women, but they never interviewed key witnesses that would support Mr. King's position, so it's our position that basically the investigation was not a thorough investigation, and so we do get to the issue of pretext in this case, and, you know, one of the reasons, or one of the things that reasons for termination are not credible, so we're saying that the reasons they gave are not credible, and the reasons why is because the sexual relationships didn't occur, and by the way, there's an allegation that there was inappropriate contact with Ms. CC, so there's a total of three women who came forward over a 16-year career. It's our position that two of them were not substantiated. The other one, we deposed her. We asked her over and over again, what did he do inappropriately? Did you have sexual relationships? She denied every time that she had any type of sexual relationship of any kind with Mr. King. There was allegations that he went to a hotel in Sioux Falls with her when that was not substantiated, and she testified that her kids came with her, and that Mr. King was actually in the Twin Cities working that day, so it's our position that those have not been substantiated, and they're pretextual, or we proved them not to be true, and I think that's a factor the court should be taking into consideration when evaluating whether or not there's pretext in this case. There's also accusations that Mr. King was going over certain orders in this matter. We actually deposed the judge who was giving those orders. The judge said he had authority to do that, and that Mr. King was, in fact, following his directive and orders properly, so that, in fact, was debunked or proven to be false as well, so there's very, very limited testimony that's actually true in the allegations against Mr. King, and even the ones that we do admit to, they're very, very de minimis in nature, so it's our position that basically we've proven that their allegations against Mr. King are false, and so that there is pretext for that, and we make it past the McDonnell-Douglas burden-shifting analysis. I got one question. You made a legal law point in the brief that caught my attention. You basically said the board, and I think by that you mean the appeals committee's upholding of the termination, the board made credibility decisions, and that means we get to a jury. What's your best case for that legal proposition? Because the pretext analysis, the only question is whether the board in making its analysis did something other than uphold a non-discriminatory reason, and if they did it for credibility reasons, fine. That doesn't make this a jury case unless you've got a case that I'm not aware of. Sure, so it's our position that under the Minnesota Judicial Branch Human Resources Rule, I believe it's 10.4e, and I'm going to quote it here. It says, in determining an appeal, the board shall not substitute its judgment for the judgment of the appointing authority, but rather the board shall determine whether the action taken by the appointing authority was reasonable under the circumstances. That's not responsive. All the committee did was affirm. I asked you for a judicial case saying that when the decision maker makes an investigation and makes credibility, reaches credibility conclusions based on its investigation, that if credibility, as I read your brief, you're saying, well, if credibility is involved, I get to a jury, and I'm asking for a case that supports that proposition. Maybe I've misread your brief. No, I think that just goes to the, it's another factor that I'd like the court to consider that they did take into consider credibility issues, and you know, under the law. Of course they did. Any investigator has to. Certainly, so I know it's maybe on a broader loop. It's our position that, you know, the court should not be evaluating credibility issues. That should be a decision that should be made by the trier of fact. In this case, we should go to a jury, and it's our position also that trouble was the appointing authority, and so like basically they couldn't substitute their judgment for her judgment, so they basically were there to rubber stamp that agreement. That's our did make some credibility determinations, and it's our position that those credibility determinations should be made by a jury or a trier of fact. Say on the question of adverse action, do you say that the adverse action was the paid administrative leave time or the termination? It's at the time of the paid administrative leave, and I would like to address this issue a little bit here. I think it's a great question. Before you go further, just let me clear up one other thing. What's the timeline on that with respect to when your client made the report? How much time before the administrative leave, and then how much time from then before the termination? Do you have that in mind? Yep, absolutely. So October 5th, 2017 is the date of the letter where we say that's the conduct. The notice or when he was placed on leave on November 27th, excuse me, November 20th, 2017, so that's approximately one month later or six weeks later. So that's the time frame when he's placed on leave, and it's our position that that's the adverse action, and that the ultimate decision when the ultimate termination was March 6th, 2018, which is when he gets full pay and benefits and so forth. I mean, there still is some adverse action, and there's a Brenner case out there where there's a string of cases from the district court saying that just being placed on administrative leave does kind of put you in a negative light with all the employers or employees. My experience on this is what I'm very concerned about is that a really slew employer will start saying, hey, look, let's just put him on a paid administration for a year, and then we'll wait a year, and then we can say, we can argue to the court, hey, it's been a year. It's no big deal. What is he complaining about? I mean, at some point in time, it's the Moore case, and I believe it's a 2019 case, which is cited in our brief, where basically the court does take that in consideration, and I would ask the court to take that in consideration. I think it's a very important point, and it also goes to how I would advise my client, but I mean, I think the concern on the plaintiff's side is certainly that I'm concerned somebody's just going to put him on a leave and then wait a certain amount of time, say six months. The federal court's basically saying after six months, they're fine. Yeah, you're afraid they'll say, well, there's no temporal proximity because it's six months later. We had him on leave for six months, but if it's all part of an operation to cause the termination, is there any evidence? Well, I see. I guess the administrative leave was for the purpose of investigating the matter that ultimately led to the termination, correct? That's correct, your honor. Yeah, so you could say, yeah, I understand. Okay, thank you. I would like to reserve the remaining time for rebuttal. Thank you. Very good. Mr. Wiener. Good morning, your honors, and may it please the court. Joe Wiener, Assistant Attorney General on Mr. King's discrimination and whistleblower claims for the reasons that the district court had in its order below. The issue in this case is that a person in a position of authority cannot use his job to coerce employees or job applicants into relationships. In this case, two separate women, years apart from each other, accused Mr. King of doing exactly that. When the board found out about this, they hired an outside investigator. The investigator interviewed these women who gave detailed information to the investigator, and the determination was made that these women had no reason to make up the stories and claim that there was something going on here when in fact there wasn't. As a result of the investigation, the board also discovered that Mr. King had engaged in another inappropriate relationship with an employee, not a sexual relationship, just a relationship that was inappropriate, that he treated her better, that he gave her a job in his private production company, that he exchanged questionable emails with her that are in the record, and that he attended holidays and gifts and gave gifts to her and her family, including Christmas on two different occasions. And in addition to all of that, there were myriad other examples of additional misconduct. With all of this here, Mr. King has had more people and more entities take a look at this case than any employment case that I can recall. There is an outside investigator who did a thorough investigation and came up with the conclusion, and Mr. King's response is the investigator was biased. It went to an appeal panel where Mr. King was able to present witnesses, cross-examine witnesses, present evidence. The appeal panel found that this stuff was true, and Mr. King's response there is the appeal panel was biased. He took it to the EEOC. The EEOC said there's not a basis here for discrimination, and his response there is this is irrelevant. And then after full discovery, after briefing and summary judgment, the district court said there is no basis here for discrimination or retaliation. And Mr. King's response there again is this is just simply wrong. The simple fact is Mr. King's whistleblower claim fails for two the only evidence that he has is temporal proximity, and the temporal proximity in this case is too attenuated under the case law in this circuit to constitute a causation for purposes of a whistleblower claim. And second, the board learned about intervening misconduct in between the time when Mr. King made his report and when it began some type of adverse employment action, and because of that intervening conduct, it erodes any idea that there's some kind of causation between the two. Mr. King is not a whistleblower, and Kristen Trebl, who was a supervisor when he brought this information forward to her, she thanked him for doing this. And then what did she do? She changed the process to address Mr. King's concern. And Mr. King admitted under oath that he had no reason to believe that she didn't legitimately thank him and that he never had any reason to believe her. Mr. King was terminated for gross misconduct, and for that reason, the court should affirm. A couple things in the factual record I just want to make sure is clear. The first is when the board first learned of this potential misconduct from Mr. King, they learned about it from individuals who had no knowledge whatsoever of Mr. King's October letter to Kristen Trebl. They were at a training, there was something about sexual harassment, and somebody pointed out, it doesn't just happen in Hollywood, and pointed to Mr. King. And then those individuals eventually raised that up the chain of command to Ms. Trebl because they were concerned about that. When the board first started talking to Mr. King about this, his response, before he even knew the subject of the investigation, was, what, I can't use my job to pick up women. That's what he says, and it's undisputed that he says that. After that, the board began an investigation and they spoke with the first woman. And after having that investigation and realizing that this was a serious matter, they went out and hired an independent investigator, someone who didn't work for the state, to go out and do a thorough investigation. This is an individual who has over 500 investigations under her belt. She works for the state, but she also works for private clients too. And she did 20 different interviews. Her report includes 35 exhibits and it's 53 pages. And what it shows is that there was a relationship between Mr. King and this first woman identified as AA. He says it's consensual. She says it was coercive. There was a second relationship between Mr. King and a woman, BB, and that relationship, they both agree, was not sexual, but that Mr. King used the opportunity for her to work with the Guardian Ad Litem program as a way to begin that relationship and start to have those discussions. There was the improper information about the wrong data management system, that he withheld information about cases from the bench, and that he was untruthful with his boss, Kristen Trebl, about work directives. All of those things were what the board relied on in making its determination. And again, as I said before, talking about the whistleblower claim, the only evidence that we have here is temporal proximity. And temporal proximity in this court has to be extremely close in time. And what we see, I think the best case for this that the court has identified, is Smith v. Allen Health Systems, where the court said 13 days is sufficient, but barely so, to determine causation on temporal proximity. Counsel, in terms of our case law on cases of this kind, who should we consider the It was ultimately her decision. You're talking about the board determination. That's just in institutional terms. That's an institutional, you're correct, Your Honor. Yes, it's institutional terms. Ms. Trebl, I think it's undisputed that she was the individual who ultimately made the determination there. I think, as Your Honor has identified, there's a little bit of a dispute about whether the causal time frame here is five and when the determination occurred, or whether it's the six weeks between when he made the report and when he was placed on administrative leave. I do want to point out that I understand the concerns that have been raised about the administrative leave cases. The case that is identified here, the plaintiff is relying on, the Moore case. In that case, the individual made a complaint. He was placed on leave for nine months. The organization completed the investigation after two months and just kept him on administrative leave for additional seven months and didn't tell him that the investigation was complete. Here, it's a completely different situation. They began the investigation when they put him out on November the 20th. They hired the investigator at the beginning of December. Ms. Soldo, the investigator, conducted that and submitted her report February 22nd. Then, less than two weeks later, the board considered that and terminated his employment. Because of that, it's completely distinguishable for Moore. That concern about an adverse employment action being used as some kind of cover so that temporal proximity would go out a long way just isn't at issue in this case. But even if we wanted to concede... Whether or not, I don't know if that's quite... I mean, I understand the difference from Moore, but there's still the concern that if they've pretty much decided to terminate the man, but they have to go through the five months of process before they can do so, that there really isn't a five-month temporal proximity as a practical matter. More to the point, the statute, as I understand it, says the test is whether the action might dissuade a reasonable employee from making a report. On these facts, could a jury find that being put on administrative leave for five months might dissuade a reasonable person from making a report? The only case that we really have that can speak to that is Moore, so those are the facts that we have. But in Moore, there was evidence that there was concern and that the people had raised concerns about the conduct of the protected individual, and they were unhappy that he had made that report. And then you had the fact that there was something here that seemed to indicate that it was a sham investigation or a sham process because he was kept out on leave for an additional seven months after they had already made a determination. I don't think it's helpful to talk about Moore. I'm just asking under this statute on these facts, I think your honor, there would have to be an administrative leave to discourage somebody from reporting misconduct. If you know the consequence is going to be an administrative leave, wouldn't that deter you from reporting misconduct? And isn't that the purpose of this statute? Your honor, I don't believe that there's any testimony in the record from Mr. King that this deterred him or he had any idea that this was going to deter him from this. What this constituted was a paid leave for him, and if it came back that he was innocent of this, he was going to be paid for that time. So I understand the point that your honor is making, but I think there has to be something more than simply being placed on a paid leave that's going to allow somebody to reach that level. But even if we were to consider the time that he's placed on an administrative leave, that's still six weeks, and that is significantly longer than the time frame that has been identified in the cases before this court. Whether we look at the Freeman case, we look at Pulzinski, we look at Keel, we look at Mervine, we look at those cases all cited in our brief, that time frame is shorter. And the only cases that Mr. King has cited that are different that say that there's a longer period of time than two weeks or six weeks that has created some inference of causation, there was some other evidence, either some type of animus from a decision maker or something that didn't line up within what had occurred. And that is simply not what we have in this case. And additionally, learning about this misconduct or this potential misconduct dilutes any inference that comes from the causal connection. They learned about this from individuals in November, and if we were in a situation where someone said, my manager was sexually harassing somebody, and the board did not conduct an investigation, they would be opening themselves up to liability. They had an obligation to conduct an investigation here, and that's what they did. And it was a thorough investigation, and it was a long one, and as a result of that, they came to their determination. Similarly, as your honor has identified, there's nothing here on the pretext piece either. The question for pretext is whether the board, and in this case Kirsten Trebl, legitimately believed that they were making the reason for their decision. And what you relied on... Counsel, I was going to ask you that because as I understand the interplay of the issues here, although the emphasis is on the whistleblower retaliation, intervening misconduct, even if intervening misconduct defeats that claim, we still have the other claims that require the McDonnell-Douglas analysis based on the intervening misconduct. Certainly, and I can address that very quickly. Then we get to pretext. Got two minutes, so what I'm going to do is I'll go to the pretext piece, your honor, and if I have time, I'll switch back. For the reasons in our brief, I don't believe Mr. King's identified a prima facie case for the discrimination claims either. But barring all of that, the scope of an investigation like this is not something, it's a business judgment, and it's not something that the courts generally look at and make a determination. They don't look through and say, you interviewed 20 witnesses, but you should have interviewed these additional three. And we see that in the McCullough case, we see that in the Mervine case. And there's a couple of reasons that the plaintiff has given for why you should discount that investigation. One is that she was paid by the state to do this. Of course she was paid. That's why you hire an outside investigator to provide that information. They're not going to do that for free. And usually these cases go the other way. They say you did this internally. You had this set in advance, you knew how you wanted to come out, and you did an internal investigation. Here they went outside to do that. And additionally, when Mr. King says that the things in here were disproven, what he really means is it was disputed. And again, if you want an example of that, what we're talking about is whether or not any of these relationships were consensual or not. Mr. King says they were consensual. These women say they were not. That's not disproven. That's disputed. And what happened there is the board made a determination about credibility and decided what was going to happen. Mr. King has not identified anybody who's similarly situated, who was treated differently than him. The hearsay argument about not listening to... I see my time's up. I will just say, unless the court has any additional questions for me, for all the reasons set forth below, there's neither a prima facie case nor pretext to satisfy either a retaliation or discrimination claim for Mr. King. Thank you, your honors. Thank you, counsel. Is there rebuttal time? Just a little bit, Mr. Sheehan. You're muted. I know that the court's well aware of the standard, but it's our position that the prima facie case was not fair. I think we've clearly articulated those reasons. Also in our summary judgment brief on page 20, I've articulated why the investigation was not fair, and I outlined about six or seven reasons of why it's our belief that they're not fair. And, you know, just to go quickly back to the points made by counsel, there's no affidavit by Ms. AA submitted in this, or Ms. BB, and Ms. Potter was asked specifically if he could have a relationship. It's on page 27 of our brief, and she says, I don't believe there are any actual HR rules that would prohibit a relationship with a volunteer guardian ad litem. So it's our position that that's not a legitimate reason and that's pretextual. For all the reasons in our brief, we ask that you reverse and remand and submit it back to the trial court for a jury trial. Very good. Thank you, counsel. The case has been thoroughly briefed and argued, and we will take it under advisement.